**Is Merchandise (and Internet Representations of Merchandise)
Bearing Designs by Charles Smith
Likely to Cause Marketplace Confusion and Dilution?**

# VOLUME 1 OF 2

Prepared for:

## QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

Prepared by:

## JACOB JACOBY, PH.D.

September 2006
J6010P/J6010Site/#2627/#2649

# <u>TABLE OF CONTENTS</u>

**PAGE**

**BACKGROUND AND OBJECTIVES**   1

    BACKGROUND   1

    OBJECTIVE   2

**PRINCIPAL FINDINGS AND CONCLUSIONS**   3

    OVERVIEW   3

    OPINIONS   5

**RESEARCH METHODOLOGY**   6

    DESIGN PRINCIPLES AND STANDARDS   6

    STUDY DESIGN CONSIDERATIONS   7

    THE SEVEN *MANUAL FOR COMPLEX LITIGATION* FACTORS   10

    FACTOR#1:  THE UNIVERSE  (OR POPULATION)   10

    FACTOR #2:  THE SAMPLING PLAN   11

    FACTOR #3:  THE QUESTIONNAIRES   13

    FACTOR #4:  INTERVIEWING PROCEDURES AND
           SUPERVISION   20

    FACTOR #5:  INSURING ACCURATE DATA   21

    FACTOR #6:  DATA ANALYSIS   24

    FACTOR #7:  INSURING OBJECTIVITY   25

**REPORT OF FINDINGS**   26

**CONCLUSIONS AND OPINIONS**   31

---

**APPENDIX A:**   Qualifications of Jacob Jacoby, Ph.D.
**APPENDIX B:**   Photo of T-shirts
**APPENDIX C:**   Screener, Main Questionnaire
**APPENDIX D:**   Supervisor and Interviewer Instructions
**APPENDIX E:**   Validation Letter and Validation Questionnaire
**APPENDIX F:**   Verbatim Transcription
**APPENDIX G:**   Respondent Classification

# I. BACKGROUND AND OBJECTIVES

**BACKGROUND:**

Wal*Mart Stores, Inc. (hereinafter referred to as Wal*Mart) is a Delaware corporation with its principal place of business in Bentonville, Arkansas. Wal*Mart is the world's largest retailer, with thousands of retail outlets across the United States and more than a dozen other countries.  Among others, Wal*Mart's trademarks include, in addition to the name "Wal*Mart," the name "Wal*Mart" where the two components of the mark are separated by a five-pointed star instead of a hyphen, and a circular yellow "smiley face."

Charles Smith, an individual, is a resident of Conyers, Georgia. Professing to express his views regarding Wal*Mart, Mr. Smith created several designs, had these affixed to various items of merchandise (tee-shirts, hats, bumper stickers) and offered these items for sale over the Internet through an arrangement with Café Press, a California firm that imprints images on physical products.

Initially, Mr. Smith created designs that merged the first portion of the name Wal*Mart (namely, the syllable Wal) with the major portion of the word "holocaust" to form the name "WAL*OCAUST."  Instead of a hyphen separating the two components, the name used a five-pointed star.  This name sometimes appears on merchandise along with a yellow smiley face.

More recently, Mr. Smith created designs that merged the first portion of the name Wal*Mart (namely, the syllable Wal) with the name Qaeda (as in "al-Qaeda") to form the name "WAL-QAEDA."

1

**OBJECTIVES:**

Counsel acting on behalf of Wal*Mart contacted Jacob Jacoby,[1] the author of this report, with the request that he design and conduct consumer research to provide empirical evidence regarding two issues.  The objectives of the research were:

1.    To determine whether (and if so, to what extent), when confronted with merchandise bearing Mr. Smith's designs either in person or via the Internet, prospective consumers would be confused into believing that these items either came from Wal*Mart, came from a firm affiliated with Wal*Mart, or had been authorized by Wal*Mart.

2.    To determine whether (and if so, to what extent) exposure to Mr. Smith's designs would generate dilution via tarnishment.

As described more fully below, this report describes the design, implementation and findings of the investigations conducted to address these questions.

---

[1] Jacob Jacoby's vita is provided in Appendix A.  Also provided therein is a list of his publications for the last 10 years, a list of his courtroom and deposition testimony for the last four years, and a statement of the cost of this investigation.

## II.  PRINCIPAL FINDINGS AND CONCLUSIONS

**OVERVIEW:**

The investigation involved two surveys.  The first survey studied both the confusion and dilution likely to result from people seeing a tee-shirt with "WAL*OCAUST" or "WAL-QAEDA" on it.  Hereinafter, this will be referred to as the "Product Survey."  The second survey studied the confusion and dilution likely to result from people seeing a web-site that displayed and offered for sale tee-shirts with "WAL*OCAUST" or "WAL-QAEDA" on them.  Hereinafter, this will be referred to as the "Website Survey."

The studies are based on interviews with 657 respondents who were interviewed at sites in eight markets around the contiguous United States.  The respondents were 13 years old or older[2] and said that, in the past year or so, they had purchased tee-shirts with words, symbols or designs on the front, or said they intended to purchase such an item in the next year or so.  Additionally, those in the Website Survey also said they had searched for information about products or services on-line in the past month or so.

Each respondent was shown an exemplar of defendant's shirt (or on-screen pages from the website that displayed it) and asked to look at what they were shown as they normally would.  After indicating they were done, the respondents were asked several questions designed to ascertain confusion (as to source, business association or connection, or authorization) and dilution.  Based on their answers to these questions, each respondent was classified as being confused or not confused

---

[2] The age 13 was selected because that is the youngest age at which people are permitted to buy merchandise from Café Press, the site on which Mr. Smith's merchandise is offered for sale.

and also as reflecting dilution or not.  (See Appendix G for Respondent Classification).

**Net Confusion.**  After subtracting for "noise," the overall rate of confusion for the *Product Survey* (in which respondents were shown actual tee-shirts) was found to be 48%.  That is, for reasons having to do with Wal*Mart's trademarks, nearly one in two relevant consumers were confused into believing that Defendants' tee-shirts either:

- were put out by Wal*Mart, or

- came from a company or store that has a business association or connection with the Wal*Mart, or

- needed to get, or got authorization from Wal*Mart to put out the shirt.

After subtracting for "noise," the overall rate of confusion for the *Website Survey* (in which respondents were shown online representations of tee-shirts) was found to be 41%.  That is, for reasons having to do with Wal*Mart's trademarks, more than two in five relevant consumers were confused into believing that Defendants' tee-shirts either:

- were put out by Wal*Mart, or

- came from a company or store that has a business association or connection with the Wal*Mart, or

- needed to get, or got authorization from Wal*Mart to put out the shirt.

**Net Dilution.**  After subtracting for "noise," the overall dilution rate for the *Product Survey* was found to be 23% and the overall dilution rate for the *Website Survey* was found to be 17%.   For reasons having to do with making an association

between the items they were shown and Wal*Mart, more than one in five relevant consumers said either that:

- they would be less likely to shop at Wal*Mart, or

- they would be more likely to buy the tee-shirt they were shown.

**OPINIONS:**

My opinions, which are based upon the study and its findings, are as follows:

a.  In my opinion, whether seen *in vivo* or on-line, the tested tee-shirts designed by Mr. Charles Smith are likely to cause a not insubstantial proportion of consumers to be confused into believing either that (a) they are put out by Wal*Mart, (b) come from a source that has a business association with Wal*Mart, or (c) to come out using its designs, it needed to get or got permission from Wal*Mart.

b.  In my opinion, whether seen *in vivo* or on-line, the tested tee-shirts designed by Mr. Charles Smith are likely to cause a not insubstantial proportion of consumers to be less likely to shop at Wal*Mart.

## III.   RESEARCH METHODOLOGY

**A.  DESIGN PRINCIPLES AND STANDARDS**

The study was designed and conducted in strict accordance with the seven-factor framework cited in the Federal Judicial Center's *Manual for Complex Litigation, Third* (Section 21.493, page 102; 1995), and with the greater amplification of this framework provided in the "Reference Guide on Survey Research" appearing in the FJC's 1994 *Reference Manual on Scientific Research.*[3] Also considered in the design of this investigation were the implications of the Supreme Court's opinion in *Daubert v. Merrell Dow.*[4]

The seven factors from the *Manual for Complex Litigation* are quoted verbatim below.  The order in which they are cited departs from the original to more closely track the sequence of activities that typically occurs during the research process.

✓    The population was properly chosen and defined;

✓    The sample chosen was representative of that population;

✓    The questions asked were clear and not leading;

✓    The survey was conducted by qualified people following proper interviewing procedures;

✓    The data gathered were accurately reported;

✓    The data were analyzed in accordance with accepted statistical principles;

---

[3] At the request of the Federal Judicial Center, Jacob Jacoby served as a peer reviewer for the *Reference Guide on Survey Research* that appears in both the first (1994) and second (2000) editions of the *Reference Manual on Scientific Research.*

[3] *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993).

6

✓    The process was conducted so as to insure objectivity.

How the seven *Manual for Complex Litigation* factors were applied in the current investigation is discussed below.  The discussion departs from the listed order in three respects.

First, the researchers' qualifications (an element of Factor #4) are set forth in Appendix A.  The Princeton Research and Consulting Center, Inc. served as our principal subcontractor for this project.  A brief description of their qualifications is provided in Appendix A as well.

Second, as exemplified throughout this report, Factor #7 -- the need to insure objectivity -- exerted a pervasive impact throughout the design, implementation and interpretation of all aspects of the investigation.

Third, discussion of the seven factors is preceded by a brief discussion of the design of the study.


## B. STUDY DESIGN CONSIDERATIONS

A variety of considerations factored into just what needed to be studied.  First, I am given to understand that two names are at issue, namely, WAL*OCAUST and WAL-QAEDA.  For this reason, it was decided that the study needed to investigate both names.

Second, the pertinent marketplace consists of Internet representations of Mr. Smith's designs as well as products bearing these designs.  Accordingly, it was decided that the investigation should study both Internet representations as well as physical products.  (As described more fully below, this necessitated

7

using two slightly different universe definitions as well as developing different forms of the questionnaires.)

Third, the pertinent marketplace also consists of Mr. Smith's designs (of which there are several) appearing on different types of products (of which there are several, namely, tee-shirts, bumper stickers, and tee-shirts). As it would involve dozens of separate test groups, it would be impractical to study all possible design permutations, for each name (WAL*OCAUST and WAL-QAEDA), on each type of product, in both the physical product and Internet form, it was decided to test two of the designs as these appear on one of the products (tee-shirts). The two designs selected for study may be described as follows:

- Using a star to separate the terms instead of a hyphen, the name WAL*OCAUST presented in all uppercase letters and appearing above an eagle with outstretched wings whose claws are holding a yellow smiley face circle.

- The name WAL-QAEDA presented in all uppercase letters appearing below the words "Support our troops. Boycott..." (A photo of these two tee-shirts is provided in Appendix B).

In all, the investigation involved respondents assigned to one of eight separate groups. Approximately half the respondents were assigned to one of four Test groups. These respondents saw one of the following contested items:

1. As described above, a physical tee-shirt bearing the WAL*OCAUST design;

2. As described above, a physical tee-shirt bearing the WAL-QAEDA design;

3.  The tee-shirt bearing the WAL*OCAUST design as represented over the Internet and appearing on a computer monitor;

4.  The tee-shirt bearing the WAL-QAEDA design as represented over the Internet and appearing on a computer monitor.

The confusion found in a survey might be caused by a number of factors, not all of which necessarily reflect confusion for the reason(s) being alleged. Normally, some portion (possibly all) of the observed confusion may be caused by extraneous factors not relevant to the allegation(s), or by the questions asked, or as a consequence of respondent guessing. One way social scientists handle and adjust for such potential alternative explanations for their findings is to use both a Test (of the allegedly confusing item) and a Control condition (that tests for a comparable item not alleged to reach the threshold for actionable confusion).[5]

Corresponding to the four Test groups, this investigation used four separate Control groups. The respondents assigned to the Control groups saw the same items as did the respondents assigned to the Test groups, with one important exception. The letter "Z" was substituted for the letter "W" so that, instead of seeing the names WAL*OCAUST or WAL-QAEDA, they saw the names ZAL-OCAUST and ZAL-QAEDA. (A photo of these two tee-shirts are also provided in Appendix B). Thus, respondents assigned to the Control groups saw one of the following items:

1.  A physical tee-shirt bearing the ZAL-OCAUST design;

2.  A physical tee-shirt bearing the ZAL-QAEDA design;

---

4.  An overview of the approach is provided in: Jacob Jacoby (2002) Experimental design and the selection of controls in trademark and deceptive advertising surveys. 92 (4) *The Trademark Reporter.* Pages 890-956.

3.    A tee-shirt bearing the ZAL-OCAUST design as represented over a computer monitor;

4.    A tee-shirt bearing the ZAL-QAEDA design as represented over a computer monitor.

Last, as a basis for claiming dilution, it must be demonstrated that the mark in question is a famous mark. As ample extrinsic evidence exists to show that the Wal*Mart marks at issue qualify as famous marks, no independent effort was made to assess their fame. Fame was assumed to be a given.

General Protocol

The protocol for the respondents in each of the eight groups involved the following. The respondent was shown the item, either a physical tee-shirt or an Internet representation. Next, the respondent was asked a series of questions designed to ascertain confusion as to source, confusion as to affiliation or connection, or confusion as to authorization or sponsorship. This series of questions was followed by a second series of questions designed to ascertain dilution via tarnishment.

## C. THE SEVEN *MANUAL FOR COMPLEX LITIGATION* FACTORS

### FACTOR #1:   *THE UNIVERSE (OR POPULATION)*

To be useful, research needs to ensure that it focuses on the "proper respondents," namely, those whose states of mind are at issue.

For the four groups (two Test and two Control) assigned to be exposed to the physical tee-shirts, the universe was defined as males and females, age 13

and older[6], who in the past year or so bought, or in the coming year would consider buying, either a tee-shirt, a bumper sticker, or a coffee mug with words, symbols or designs on it.

For the four groups (two Test and two Control) assigned to be exposed to the Internet representations of the tee-shirts, the universe was defined as above, but with the additional requirement that the respondent had to have gone on-line and searched for information or products in the past month or so.

## FACTOR #2:   *THE SAMPLING PLAN*

Theoretically, it would appear best if one could take a census; that is, test all members of the relevant population.  However, generally speaking, this is neither possible nor practical.  Accordingly, researchers test only a subset (or "sample") of that population.  Then, utilizing well-established, generally accepted methods, the findings from the sample are extrapolated to the relevant population as a whole.

The set of rules that one uses for selecting a sample is termed the sampling plan, and there are two broad categories of approaches: probability and non-probability plans.  A probability sample is one in which every respondent has a known probability of being included in the sample.  (For example, this would be equivalent to knowing that each specific card in a standard deck had a 1 in 52 chance of being selected on the first draw.)  In a non-probability sample, one does not know the probability, or odds, of selecting any particular respondent.

---

[6] The age 13 was selected because that is the youngest age at which people are permitted to buy merchandise from Café Press, the site on which Mr. Smith's merchandise is offered for sale.

The plan for this study was a non-probability sampling plan.

In marketing and consumer research, non-probability sampling designs are the overwhelming designs of choice when physical objects or similar materials (such as products, product packaging, brochures or advertisements) need to be shown to respondents. Well-conducted non-probability samples are widely relied upon by both academic and commercial (e.g., marketing and advertising) researchers, and many business decisions of considerable consequence are predicated on results derived from studies that employ such plans.[7] The overwhelming majority of consumer reaction studies submitted for litigated matters are based on non-probability samples.

When applying non-probability sampling, so as to avoid including population members who might be atypically sensitized to the issue and therefore not representative of the population as a whole, it is generally considered good research practice to exclude people who, though otherwise qualified, live in households where someone works in:

    a.  marketing research or advertising, or

    b.  a business located in the mall where the interview was being conducted.

**Market Selection.** Since the website can be accessed anywhere in the United States, the study was conducted in eight nationally distributed markets, two markets for each U.S. Census Division. The markets were:

East:          Trumbull, CT; Philadelphia, PA;
Central:     Youngstown, OH; Chicago Ridge, IL;

---

[7]  See Jacob Jacoby and Amy Handlin, 1991, "Non-probability designs for litigation surveys," *The Trademark Reporter, Volume 81 (2), pages 169-179.*

South:     Louisville, KY; San Antonio, TX;
West:      Colorado Springs, CO; and Northridge, CA. (Portland, OR was also
           used for the website survey.)

**Selection of Interviewing Services within Markets.**   The local interviewing service used in each market was selected based on: (a) Princeton Research and Consulting Center (PRCC's)[8] experience with or knowledge of them; (b) their having the ability to recruit and interview qualified individuals for the study; (c) their having experienced professional interviewers available during the time period required for conducting the interviews; and (d) their being able to conduct the study within the necessary time frame.

**Selection of Respondents.**   The interviewers intercepted potential respondents in the shopping malls according to the standard procedure followed in their mall and then initiated conversations with these individuals in the manner specified at the beginning of the Screener Questionnaire.

**FACTOR #3:**   *THE QUESTIONNAIRES*

As is customary practice, the interview involved using two types of questionnaires. The first type, termed the "Screener," was used for identifying members of the previously defined universe. The second type, termed the "Main Questionnaire," was designed to assess the substantive questions at issue. Copies of the questionnaires are produced in Appendix C. In constructing these questionnaires, close attention was paid to the wording and ordering of questions

---

[8] The Princeton Research and Consulting Center served as our principal subcontractor for this project. A brief description of their qualifications is provided in Appendix A.

to ensure that the questions asked, and the order in which they were asked, were clear and not leading or otherwise biasing.

**Screener Questionnaire (Respondent Qualification).** The principal purpose of a Screener is to ensure that interviews (as implemented through the Main Questionnaire) are conducted only with respondents who: (1) satisfy the universe definition, and (2) may be considered representative members of that universe. It does so, first, by making certain that the prospective respondent satisfies the universe definition and, second, by excluding from participation those considered likely to be highly atypical members of the universe.

The screeners for both the Product Survey and Website Survey shared most of the same questions. Both began by asking for the respondent's age and eliminating those under 13 (Screener Question A).

The Product Survey then asked if, during the past year or so, the respondent had bought

> *"any t-shirts with words, symbols or designs on the front"*
> *"any bumper stickers" or*
> *"any coffee mugs with words, symbols or designs on them."*

or if the respondent would consider buying any of them in the next year or so (Questions B1 and B2).

Additional questions focused on screening out people with a higher likelihood of having been sensitized to the issues at hand or to possess special familiarity that might yield atypical responses not representative of the population as a whole. Screener Question C excluded those who worked for, or lived with someone who worked for, a market research company, an advertising agency, or a store in the

mall where the interview was conducted.  The Question D series confirmed that if the respondent used eyeglasses or contact lenses, they had these with them.

Individuals who qualified were asked to participate in the study (Question F). Those who agreed were invited into an enclosed testing facility.

In addition to the screening questions mentioned above, the Screening Questionnaire for the Website Survey asked if the respondent had used a computer in the past month (Screener Question B), used the Internet in the past month (Screener Question C), used the Internet in the past month to search for information about products or services (Screener Question D).  "Yes" answers were required to all three questions.  The questions concerning eyeglasses or contact lenses were asked regarding using the Internet (Screener Question series G).

**Main Questionnaire.**

Both Product and Website surveys used the same questions to assess confusion and dilution.  They differed only in the introductory wording used to provide a context-specific frame of reference for the respondent.

**Product Survey.**  The interview for the Product Survey began with the interviewer confirming that the respondent was looking at the correct shirt.  Then, to provide a context, the interviewer said

> I'd like you to suppose you happened to be near someone
> wearing this t-shirt.  Please look at it for as long as you normally
> would.  Just tell me when you are done.

Next, to discourage guessing, the interviewer said:

> For each of my questions, if you don't know or don't have an
> answer, that's O.K.  Just tell me you "don't know" or "don't have an
> answer" and we'll go on to the next question.  Okay?

The Question 1 series tested for confusion as to source.

> *If you have any thoughts about this, which company or store do you think puts out this shirt?* With one probe of: *Any other companies or stores.* (Question 1a)

For each name given in Question 1a, the interviewer asked Question 1b.

> *What is it about the shirt that makes you think it is put out by _____?* With two probes of *Anything else?*

If the respondent mentioned "Sears," "Wal*Mart," "K-Mart" or "Youngblood's" (a fictitious name) in response to the Question 1 series, the interviewer skipped to Question 5a. Otherwise, the interviewer asked Question 2a, which dealt with confusion as to connection or relationship.

> *If you have any thoughts about it, do you think the company or store that puts out this shirt does have a business connection or relationship with another company, or do you think the company or store that puts out this shirt does not have a business connection or relationship with another company?*

If the respondent said it did, the interviewer asked Question 2b.

> *With whom do you think it has a business connection or relationship?*

For each name given in answer to Question 2b, the interviewer asked Question 2c.

> *What, in particular, makes you think that the company or store that puts out this shirt does have a business connection or relationship with _ ?* With one probe of: *Anything else?* (If the respondent mentioned "look(s)," "appearance," "design," "name," "words" or the equivalent, the interviewer probed with: *What, in particular, is it about ___(USE RESPONDENT'S OWN WORDS) that makes you think the company or store that puts out this shirt does have a business connection or relationship with ____ (USE RESPONDENT'S ANSWER FROM Q.2b)?* With one probe of: *Can you describe that in more detail?* And one probe of: *Anything else?)*

If the respondent mentioned "Sears," "Wal*Mart," "K-Mart" or "Youngblood's" in answer to the Question 2 series, the interviewer skipped to Question 5a. Otherwise, the interviewer handed the respondent a card containing answer choices and asked Question 3a, which dealt with confusion as to authorization or sponsorship.

> *Do you think that, in order to put out this shirt, the company that puts it out did* not *need to get permission from another company — so they did* not *get it, did* not *need to get permission from another company — but they* did *get it anyway, did* not *need to get permission from another company — but you have* no idea *if they got it,* needed *to get permission from another company — and* got *it,* needed *to get permission from another company — but did* not get *it,* needed *to get permission from another company — but you have* no idea *if they got it, or something else?*

If the respondent said the source needed to get, or got, permission, they were asked Question 3c.

> *From whom did they (need to get / get) permission or authorization?* With one probe of *Anyone else?*

And for each answer given in Question 3c the interviewer asked Question 3d.

> *What is it about the shirt that makes you think that, to put out the shirt you saw, the company (needed to get / got) permission or authorization from ___ (NAME IN Q.3c)?* With two probes of *Anything else?*

If the respondent mentioned "Sears," "Wal*Mart," "K-Mart," or "Youngblood's" in answer to the question 3 series, the interviewer skipped to Question 5a. Otherwise, the interviewer asked Question 4a.

> *If anything, what does this shirt make you think of?* With one probe of *Anything else?*

If the respondent mentioned "Sears," "Wal*Mart," "Youngblood's" or "K-Mart," the interviewer asked to Question 4b for each one.

> *What is it about the shirt that makes you think of ___? With one probe of Anything else?*

Then the interviewer skipped to the instruction before Question 5a.

Otherwise, the interviewer skipped to Question 4c.

> *Does this shirt make you think of any particular companies or stores?*

If the respondent said "no" or didn't know, they skipped to the instruction before Question 6. If the respondent said "yes," he or she was asked Question 4d.

> *Which companies or stores does it make you think of? With one probe of: Anything else?*

If the respondent mentioned "Sears," "Wal*Mart," "Youngblood's" or "K-Mart," the interviewer asked to Question 4e for each one.

> *What is it about the shirt that makes you think of ___? With one probe of Anything else?*

If the respondent mentioned "Sears," "Wal*Mart," "Youngblood's" or "K-Mart" in Questions 1a, 2b, 3c, 4a or 4d, the interviewer asked Question 5a for any store named. Otherwise, the interviewer covered the shirt, took back Card A and asked Question 6.

Question 5a asked:

> *Does seeing this shirt make you considerably __more__ likely to shop at _____, somewhat __more__ likely to shop at _____, neither __more likely nor less likely__, somewhat __less__ likely to shop at _____, or considerably __less__ likely to shop at _____?*

Then the interviewer asked Question 5b.

> *Thinking about this shirt, does the fact that the shirt made you think of _____ make it __considerably__ less likely you would buy this shirt, __somewhat__ less likely you would buy this shirt, __neither more likely nor less likely__, __somewhat__ more likely you would buy this shirt, or __considerably__ more likely you would buy this shirt?*

Then the interviewer covered the shirt, took back Card A and had the respondent sign a statement certifying that the respondent looked at a shirt and was asked some questions about it.  Next, the interviewers asked for the information necessary for conducting the post-survey validation and signed a statement certifying that they carried out the interview according to their interviewer instructions.

**Website Survey**.  The Website Survey differed from the Product Survey in that the interviewer initially said:

> *This is a nationwide survey involving different on-line searches. Different people are being taken through different searches, after which they are asked questions about some of what they looked at.*

After checking that the respondent was looking at the proper card (name of a website) and proper Internet screen, the respondent was given instructions on how to "navigate" the website and guided to viewing the appropriate tee-shirt.

While seeing an enlarged view of the tee-shirt, the respondent was told,

> *I would like you to take as much time to look at this shirt as you would if you found it interesting and were considering whether or not to order it for yourself or for someone else.  Feel free to scroll up or down, or side-to-side.  Just tell me when you are done.*

After they were through looking at the shirt, to discourage guessing, the interviewer said,

> *For each of my questions, if you don't know or don't have an answer, that's O.K.  Just tell me you "don't know" or "don't have an answer" and we'll go on to the next question.  Okay?*

The remainder of the Website Survey questionnaire was the same as the Product Survey described above.

**FACTOR #4:**   *INTERVIEWING PROCEDURES AND SUPERVISION*

Throughout the project, tight control and supervision were maintained over all aspects of the interviewing.

Interviewers and Interviewer Training.

A professional interviewing service was retained to conduct the interviews. Under the direction of this author, PRCC prepared customized, detailed Supervisor and Interviewer Instructions for this assignment.  Copies of these instructions are provided in Appendix D of this report.

A representative from PRCC conducted a conference call briefing with the local field supervisor before that person, in turn, briefed the interviewers.  Before beginning work on this study, each interviewer was required to:

- read the interviewer instructions (see Appendix D);

- attend a personal briefing conducted by a member of the interviewing organization.  (At this briefing, the interviewing procedures were reviewed in detail, question by question); and

- complete two practice interviews, one as a respondent and another as an interviewer.

PRCC received daily updates on the status of the interviewing efforts and communicated these to the author.

Double-Blind Interviewing.

In accordance with standard custom and practice for surveys conducted to be proffered as evidence, the study was administered under "double-blind" conditions.  That is, not only were the respondents kept uninformed about the

purpose and sponsorship of the study, but both the interviewers and field supervisors were similarly "blind" with respect to the purpose and sponsorship. Without such knowledge, the possibility that either some interviewer(s) or some respondent(s) might correctly guess the purpose and/or the sponsor of the investigation is minimized. At no time were either the supervisors or interviewers told that the study might be used for purposes of litigation.

**Implementation Period.**

For the Product Survey, interviewing began on August 2, 2006 and concluded on August 31, 2006. For the Website Survey, interviewing began on August 16, 2006 and concluded on August 31, 2006.

**FACTOR #5:  *INSURING ACCURATE DATA***

**Field Check-In.**  When the 322 completed interviews for the Product Survey and the 335 completed interviews for the Website Survey were returned, they were reviewed to ensure that each respondent was qualified to participate in the study and that the questionnaires had been completed properly. As a consequence of this quality check, one questionnaire was eliminated from the Product Survey and two questionnaires were eliminated from the Website Survey.

**Respondent Validation.**  Validation involves attempting to re-contact each respondent several days after being interviewed to verify that they did indeed participate in the study. The validation effort for both surveys began on August 24, 2006 and ended on September 12, 2006. A summary of the validation findings is as follows.

The names and phone numbers of all respondents from both surveys remaining after check-in were sent to an independent telephone interviewing service, The Pat Henry Group, for validation. This service was given the responsibility for attempting a 100% validation – that is, for re-contacting, by telephone, each respondent to confirm that he/she had been interviewed for this study. Made at different times of the day and different days of the week, at least three validation calls were made in an attempt to reach each respondent and more than 60% of the respondents in both the Product and Website surveys were reached.

In the Product Survey, a total of 181 respondents, representing 56% of the usable sample, were "positively validated."   This percentage is well in excess of common industry practice.[9] Another 13 respondents (representing 4%) acknowledged having participated in the study, but then gave answers to the validation questions that were inconsistent with answers they previously had given to the original screening questions. As an exercise in caution, the data for these individuals were excluded from the analyses reported below. Three other respondents (representing 1%) claimed not to have participated in the survey and were deemed to be invalid. One-hundred–twenty-four respondents (representing 39% of the respondents in the Product survey) could not be reached in the time available for validation. In keeping with generally accepted procedure in the field, the data for these people are included in the analyses.

---

[9]   When validation is done, higher-quality marketing research generally validates at a rate of 10% to 25%. When conducted for the purpose of being proffered as evidence in a litigated matter, one feature of higher quality surveys is that they attempt 100% validation, typically retaining a completely independent firm for this purpose.

In the Website Survey, a total of 169 respondents, representing 51% of the usable sample, were "positively validated." This percentage is well in excess of common industry practice.[10] In the Website Survey, another 45 respondents (representing 14%) acknowledged having participated in the study, but gave answers to the validation questions that were inconsistent with answers they previously had given to the original screening questions. (Thirty-two of them, 10%, failed because they said "no" or "don't remember" to "Over the past month or so, have you gone on-line to search for information about products or services?") As an exercise in caution, the data for all 45 of these individuals were excluded from the analyses reported below. When reached, one respondent (representing 0.3%) claimed not to have participated in the survey and was deemed to be invalid. One-hundred-eighteen respondents (representing 35%) could not be reached in the time available for validation. In keeping with generally accepted procedure in the field, the data for these people are included in the analyses.

Thus, the results of the validation effort were as follows:

|  | Product Survey | Website Survey |
|---|---|---|
| Base = | (321) | (333) |
|  | % | % |
| Reached and ... |  |  |
| ... Positively Validated | 56 | 51 |
| ... Judged to be Invalid | 1 | <0.5 |
| ... Gave inconsistent answers | 4 | 14 |
| Not reached and presumed valid | 39 | 35 |

---

[10]   When validation is done, higher-quality marketing research generally validates at a rate of 10% to 25%. When conducted for the purpose of being proffered as evidence in a litigated matter, one feature of higher quality surveys is that they attempt 100% validation, typically retaining a completely independent firm for this purpose.

Copies of the validation report and validation questionnaire are included as Appendix E of this report.

**FACTOR #6:** *DATA ANALYSIS*

Confusion

Three types of confusion were measured: Confusion as to Source, Confusion as to Relationship or Association, and Confusion as to Sponsorship or Authorization. In each instance, to be tallied as confused, the respondent had to meet two tests. These two tests were designed to produce a conservative estimate of confusion.

1) As the first hurdle, the respondent had to be confused into believing that the shirt seen either came from Wal*Mart (the Question 1 series), came from a company that had some business connection or relationship with Wal*Mart (the question 2 series), or came from a source that required or obtained permission from Wal*Mart (the Question 3 series).

2) As the second hurdle, when asked to indicate what made them arrive at that understanding, the respondent had to say either it was because of the prefix "Wal," the name (or equivalent), because of mention the "smiley face" or mention the star after the prefix "Wal."

Dilution

To satisfy the requirement for dilution, a respondent had to meet two criteria.

24

1) The respondent had to mention Wal*Mart in answer to Question 1a, 2b, 3c, 4a or 4b (in that way, showing that exposure to defendant's design caused them to call Wal*Mart to mind), and

2) The respondent had to indicate that:

   a) due to seeing defendant's design, they were less likely to shop at Wal*Mart, or

   b) due to the fact that defendant's design brought Wal*Mart to mind, they were more likely to buy defendant's shirt.

## FACTORS #7: *INSURING OBJECTIVITY*

As explicated and described herein, every aspect of the research process was designed to insure objectivity in the collection and interpretation of the data.

## IV.    REPORT OF FINDINGS

After eliminating three respondents because of errors in administration and

another 62 respondents as a result of the post-survey validation effort (described

above), the data from a total of 592 respondents -- 305 for the Product Survey and

287 for the Website Survey -- were available for analysis.    Appendix F contains a

transcript of the verbatim answers given by the respondents to all the questions they

were asked.

### Confusion Findings

Table 1a summarizes the confusion findings for the Product Survey

showing respondents physical tee-shirts and Table 1b summarizes the confusion

findings for the Website Survey showing respondents on-line representations of

physical tee-shirts.  In "reading" these tables, note that the three left-most

columns describe the findings for defendant's two shirts (both separately and

averaged), while the next three columns describe the findings for the

corresponding control shirts (both separately and averaged) used to assess

noise.  The seventh, right-most column (labeled "Net") indicates the finding that

results when one subtracts the average (arithmetic Mean) confusion estimate

obtained with the Control shirts from the average (arithmetic Mean) confusion

estimate obtained with the Test shirts.

As can be seen from Table 1a, after being adjusted for noise, the overall

rate of confusion associated with the two physical tee-shirts is 47.8%.  Most of

this confusion (43.6%) is due to the respondents being confused as to source,

that is, thinking that the two test shirts were put out by Wal*Mart either because

of the prefix "Wal," because of the "name" (or equivalent), because of the "smiley face" and/or because of the star after the prefix "Wal."   The overall (net) confusion finding was greater for the shirt bearing the WAL*OCAUST design (69.9% - 3.8% = 66.1%) than for the shirt bearing the WAL-QAEDA design (30.3% - 0% = 30.3%).

**TABLE 1a: PRODUCT CONFUSION**

|  | TEST STIMULI | | | CONTROL STIMULI | | | |
|---|---|---|---|---|---|---|---|
|  | PHYSICAL TEE-SHIRTS | | | | | | |
|  | WAL*OCAUST | WAL-QAEDA | MEAN | ZAL-OCAUST | ZAL-QAEDA | MEAN | NET |
| Base= | (73) % | (76) % | (149) % | (79) % | (77) % | (156) % | % |
| Type of Confusion |  |  |  |  |  |  |  |
| Source | 63.0 | 26.3 | 44.2 | 1.3 | 0 | 0.6 | 43.6 |
| Connection | 4.1 | 2.6 | 3.4 | 2.5 | 0 | 1.3 | 2.1 |
| Sponsorship | 2.7 | 1.3 | 2.0 | 0 | 0 | 0 | 2.0 |
| NET | 69.9 | 30.3 | 49.7 | 3.8 | 0 | 1.9 | 47.8 |

As can be seen from Table 1b, the overall rate of confusion associated with the on-line representations of the tee-shirts is 40.8%.  Most of this confusion (34.1%) is due to the respondents being confused as to source, that is, thinking that the two test shirts were put out by Wal*Mart either because of the prefix "Wal," because of the "name" (or equivalent), because of the "smiley face" and/or because of the star after the prefix "Wal."   The overall (net) confusion finding was greater for the shirt bearing the WAL*OCAUST design (54.3% - 5.8% = 48.5%) than for the shirt bearing the WAL-QAEDA design (41.0% - 7.1% = 33.9%).

27

**TABLE 1b:  WEBSITE CONFUSION**

| | TEST STIMULI | | | CONTROL STIMULI | | | |
|---|---|---|---|---|---|---|---|
| | INTERNET MONITOR REPRESENTATIONS OF TEE-SHIRTS | | | | | | |
| | WAL*OCA UST | WAL-QAEDA | MEAN | ZAL-OCAUST | ZAL-QAEDA | MEAN | NET |
| Base = | (70) | (78) | (148) | (69) | (70) | (139) | |
| | <u>%</u> | <u>%</u> | <u>%</u> | <u>%</u> | <u>%</u> | <u>%</u> | <u>%</u> |
| **Type of Confusion** | | | | | | | |
| Source | 45.7 | 34.6 | 39.9 | 4.3 | 7.1 | 5.8 | 34.1 |
| Connection | 2.9 | 1.3 | 2.0 | 0.0 | 0.0 | 0.0 | 2.0 |
| Sponsorship | 5.7 | 5.1 | 5.4 | 1.4 | 0.0 | 0.7 | 4.7 |
| NET | 54.3 | 41.0 | 47.3 | 5.8 | 7.1 | 6.5 | 40.8 |

## Dilution Findings

Table 2a summarizes the dilution findings for the Product Survey showing respondents physical tee-shirts and Table 2b summarizes the dilution findings for the Website Survey showing respondents on-line representations of physical tee-shirts.  As before, when "reading" these tables, note that the three left-most columns describe the findings for defendant's two shirts (both separately and averaged), while the next three columns describe the findings for the corresponding control shirts (both separately and averaged) used to assess noise.  The seventh, right-most column (labeled "Net") indicates the finding that results when one subtracts the average (arithmetic Mean) dilution estimate obtained with the Control shirts from the average (arithmetic Mean) dilution estimate obtained with the Test shirts.

28

As can be seen from Table 2a, after being adjusted for noise, the overall rate of dilution (when dilution is considered to represent the second comer having a negative impact on the likely sales of the first comer, or the first comer having a positive impact on the likely sales of the second comer) associated with the two physical tee-shirts is 23.1%.  After being adjusted for "noise"(30.2% - 7.1%), a net of 17.1% -- or one in six consumers -- said that seeing the defendant's tee-shirts would make them less likely to shop at Wal*Mart.  This diluting impact was greater for the shirt bearing the WAL*OCAUST design than for the shirt bearing the WAL-QAEDA design.

### TABLE 2a:  PRODUCT DILUTION

| Base= | TEST STIMULI | | | CONTROL STIMULI | | | |
| | PHYSICAL TEE-SHIRTS | | | | | | |
| | WAL* OCAUST (73) % | WAL- QAEDA (76) % | Mean (149) % | ZAL- OCAUST (79) % | ZAL- QAEDA (77) % | Mean (156) % | NET % |
|---|---|---|---|---|---|---|---|
| Less likely to shop at Wal*Mart | 20.5 | 15.8 | 18.1 | 2.5 | 0 | 1.3 | 16.8 |
| More likely to buy shirt | 17.8 | 10.5 | 14.1 | 5.1 | 6.3 | 5.8 | 8.3 |
| NET | 37.0 | 23.7 | 30.2 | 7.6 | 6.3 | 7.1 | 23.1 |

As can be seen from Table 2b, after being adjusted for noise, the overall rate of dilution (when dilution is considered to represent the second comer having a negative impact on the likely sales of the first comer *and/or* the first comer having a positive impact on the likely sales of the second comer) associated with online representations of the two tee-shirts is 16.6%.  After being adjusted for "noise," a net of 11.7% (18.9% - 7.2%) -- or nearly one in eight consumers -- said

that seeing the defendant's tee-shirts would make them less likely to shop at

Wal*Mart.

**TABLE 2b: WEBSITE DILUTION**

| | TEST STIMULI | | | CONTROL STIMULI | | | |
| | INTERNET MONITOR REPRESENTATIONS OF TEE-SHIRTS | | | | | | |
| Base = | WAL* OCAUST (70) % | WAL- QAEDA (78) % | MEAN (148) % | ZAL- OCAUST (69) % | ZAL- QAEDA (70) % | MEAN (139) % | NET % |
|---|---|---|---|---|---|---|---|
| Less likely to shop at Wal*Mart | 11.4 | 25.6 | 18.9 | 2.9 | 11.4 | 7.2 | 11.7 |
| More likely to buy shirt | 14.3 | 19.2 | 16.9 | 10.1 | 7.1 | 8.6 | 8.3 |
| NET | 22.9 | 41.0 | 32.4 | 13.0 | 18.6 | 15.8 | 16.6 |

## V.  CONCLUSIONS AND OPINIONS

The foregoing surveys and resultant findings lead me to the following conclusions and opinions.

c.      In my opinion, whether seen *in vivo* or on-line, the tested tee-shirts designed by Mr. Charles Smith are likely to cause a not insubstantial proportion of consumers (approximately 40% to 50%) to be confused into believing either that they (a) are put out by Wal*Mart, (b) come from a source that has a business association with Wal*Mart, or (c) to come out using its designs, it needed to get or got permission from Wal*Mart.

d.      In my opinion, whether seen *in vivo* or on-line, the tested tee-shirts designed by Mr. Charles Smith are likely to cause a not insubstantial proportion of consumers (approximately 12%) to be less likely to shop at Wal*Mart.

To the best of my knowledge and belief, the foregoing is true and correct.

Jacob Jacoby, Ph.D.